IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID:<br><br>**100028002187837**<br><br>THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK | Case No. 7:21mj130<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Adam G. Grubb, a Task Force Officer (TFO) with the Federal Bureau of Investigation, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the user ID, including the content of the subscriber's or customer's account.

2. I am a Task Force Officer with the Federal Bureau of Investigation. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

1

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. Specifically, I am a Task Force Officer with the Federal Bureau of Investigation (FBI) and have been so employed since February 2021. Your affiant has been employed as a Police Officer with the Roanoke County Police Department in Virginia for 18 years. I am currently assigned to the Richmond Division of the FBI, Roanoke Resident Agency. I am presently and have been previously assigned to investigate a variety of criminal matters, to include violent criminal acts, gangs, and drug investigations. Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause. While serving within my capacity at the FBI, I have authored search warrants concerning various federal criminal violations. I have investigated cases where electronic communications, to include social media platforms and cellular telephones, have played an integral role in the investigations. Through experience and training received, I have become familiar with how the usage of electronic devices and social media applications has become commonplace throughout the "criminal world." I am also aware that information stored at the service provider facilities and on cellular devices themselves can assist law enforcement in criminal investigations.

4. The facts in this affidavit come from my own investigation, observations, training and experience, and from information obtained from other law enforcement officers and confidential witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2113 (Bank

2

Robbery) were committed by the individual listed herein. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband, or fruits of these crimes, as described in Attachment B.

## **TECHNICAL BACKGROUND ON FACEBOOK**

6. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

7. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

8. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

9. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

10. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will

include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

12. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

14. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

15. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

18. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

19. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

20. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

21. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct

under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

22. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**PROBABLE CAUSE**

23. On February 11, 2021, Carter Bank and Trust located at 616 9th St SE Roanoke, Virginia was robbed by a black male using a note. The robber stole $565 and left the bank. On February 12, 2021, Freedom First Credit Union located at 1210 Patterson Ave SW Roanoke, VA was robbed by a black male using a note. The robber stole $4,025 and left the bank. Carter Bank and Trust and Freedom First Credit Union are both federally insured banking institutions. On February 14, 2021, Hardees located at 2619 N. Roan St. Johnson City, Tennessee was robbed at gunpoint and the suspect, SAVYON PRATHER, was caught fleeing the scene.

24. Cooperating Witness 1 (later referred to as CW1) was developed after his/her car was seen in surveillance cameras arriving and leaving the immediate area of both bank robberies. CW1 told Roanoke City Police detectives that he/she drove PRATHER to the vicinity of both banks and dropped him off about the time both banks were robbed. On both occasions PRATHER returned to his/her car, got in, and he/she drove him away. CW1 stated he/she did not know PRATHER was going to rob the banks and thought he/she was driving him to buy illegal drugs. CW1 has a prior felony and misdemeanor conviction for shoplifting.

25. On May 24, 2021, Investigators spoke with CW1, who advised he/she went to Tennessee on February 10, 2021, picked PRATHER up, and brought him back to Roanoke where they stayed at CW1 residence. CW1 advised that on February 11, 2021, he/she and PRATHER were driving around the area of the Carter Bank and Trust, around lunchtime looking

to buy some weed (marijuana). PRATHER then told CW1 to stop. He/she parked the car, and he then exited the vehicle. PRATHER then walked towards the rear of the car and continued walking until CW1 couldn't see him. CW1 remained in the vehicle, using her phone, then a short time later, PRATHER ran back to the car, and got in the back seat. PRATHER did have some weed on his person but CW1 didn't see anything else. CW1 described PRATHER wearing a stocking hat, sweater, pants, black Nike shoes and a sweater jacket. A surveillance photograph from Carter Bank and Trust video footage taken during the February 11, 2021 robbery was shown to CW1, and he/she identified the male subject to be PRATHER. The clothing seen on the individual in the surveillance photograph also matched the clothing CW1 described PRATHER as wearing.

26. CW1 advised PRATHER stayed at his/her apartment for the night of February 11, 2021. On Friday, February 12, 2021, CW1 advised they went to the Caru Apartment complex in Roanoke, and then went to the area of Freedom First Credit Union bank on Patterson Ave. NW in Roanoke. CW1 advised PRATHER had a manilla folder in his hand and that he needed to get a check cashed. PRATHER exited the vehicle, was only gone for approximately ten minutes and returned with only the manilla folder in his hand. CW1 described PRATHER as wearing a Nike hat and a blue buttoned up shirt. CW1 was shown a photograph from Freedom First Credit Union surveillance footage, where he/she identified PRATHER in the photograph. The clothing seen on the individual in the surveillance photograph matched to clothing CW1 described PRATHER as wearing. An additional photograph was shown of a silver vehicle in the area at the time of the robbery, CW1 identified that vehicle as his/her own, a silver Chevrolet Impala.

27. Cooperating Witness 2, (later referred to as CW2) was developed after he/she was identified as a potential accomplice of PRATHER in the robbery of a Super 8 motel in Johnson

City, Tennessee; that robbery occurred on February 13, 2021. CW2 was identified as a possible driver for PRATHER, and PRATHER refers to CW2 by his/her nickname in jail calls made after PRATHER was arrested in Tennessee. CW2 has a lengthy criminal history, is a self-proclaimed gang member, and advised law enforcement that he/she has spent much of his/her life in jail because the police profiled him.

28. CW2 was initially interviewed by Johnson City police officers on February 19, 2021. CW2 told Johnson City Police officers that PRATHER told him/her that he had robbed two banks in Roanoke. CW2 also advised that PRATHER stated he robbed a bank in Woodbridge. However, the Woodbridge robbery has been investigated and attributed to a different person.

29. CW2 was later interviewed by investigators on Thursday, April 22, 2021. During this interview, CW2 initially did not want to speak about what he/she had told the Johnson City Police. CW2 said, "I'm not putting PRATHER in jail for the rest of his life." CW2 relayed that he/she has known PRATHER their whole life and said that he/she is a good kid but that heroin took over his life.

30. CW2 described an incident where he/she and significant other drove PRATHER to Roanoke shortly before Valentine's Day. PRATHER was dropped off in Roanoke by CW2 and his/her significant other. CW2 dropped off PRATHER at some apartments and watched him walk inside. He/she then video chatted with PRATHER and saw the woman PRATHER was staying with in the background. That woman used the Facebook screen name "**ma banks.**" According to CW2, PRATHER never stayed longer than a few days in Roanoke.

31. CW2 stated that he/she often talks to or texts with PRATHER via Facebook Messenger. After PRATHER got back to Johnson City from Roanoke, CW2 said that they talked in person, by text, by video chat, and by Messenger. PRATHER told CW2 about the two bank

10

robberies in Roanoke. CW2 said that PRATHER sent a picture or two through Facebook Messenger with one showing the money he got from a bank robbery and the other showing a gun he bought.

32. PRATHER told CW2 about the bank robberies, but CW2 does not remember the names of the banks. PRATHER told CW2 about a folder he used to write a note that he showed the bank teller.  CW2 was asked if he/she had seen PRATHER prior to the robbery spree and stated, he/she had taken him food and talked to him via text messaging and Facebook Messenger.

33. CW2 showed investigators three Facebook accounts used by PRATHER: **ma banks** (CW1's Facebook Account), **Chosen YuhngChamp Zahkarie** (PRATHER'S Facebook Account), and **Bre Lopez** (PRATHER'S girlfriends Facebook Account). The **Chosen YuhngChamp Zahkarie** Facebook page, with account number 100028002187837, was located with direct verification.  Investigators viewed all three accounts and were able to identify all parties on each Facebook account listed above**.**

34.  CW2 indicated that the **Chosen YuhngChamp Zahkarie** account was active and had been used by PRATHER during the time of the robberies in Virginia on February 11 and 12, 2021. CW1 indicated that the **Chosen YuhngChamp Zahkarie** Facebook account username was active and was currently being used by PRATHER during the time frame of the robberies in Virginia on February 11 and 12, 2021.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

35. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

36. Based on the foregoing information, your affiant submits that probable cause exists to suggest that the individual listed above has been engaging in activity that violates Title 18, United States Code, Sections 2113 (Bank Robbery), and that information and evidence relating to these acts are located on his Facebook page.

37. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook.

38. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

/s/ Adam G. Grubb

Adam G. Grubb
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to me via reliable means on September 1, 2021.

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge